John Mejia, USB No. 13965
Leah Farrell, USB No. 13696
jmejia@acluutah.org
lfarrell@acluutah.org
ACLU of Utah Foundation
355 North 300 West
Salt Lake City, UT 84103
(801) 521-9862

Nathan Freed Wessler (*pro hac vice*)
Brett Max Kaufman (*pro hac vice*)
nwessler@aclu.org
bkaufman@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

*Attorneys for Respondents–Intervenors*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT ADMINISTRATION, <br><br> *Petitioner*, <br> v. <br><br> UTAH DEPARTMENT OF COMMERCE and UTAH DIVISION OF OCCUPATIONAL & PROFESSIONAL LICENSING, <br><br> *Respondents*. | Case No. 2:16-cv-611-DN <br><br> **RESPONDENTS–INTERVENORS' [PROPOSED] MEMORANDUM IN OPPOSITION TO PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS ISSUED BY THE DRUG ENFORCEMENT ADMINISTRATION** <br><br> **Oral Argument Requested** <br><br> Chief Judge David Nuffer <br> Magistrate Judge Dustin B. Pead |

UNITED STATES DEPARTMENT OF
JUSTICE, DRUG ENFORCEMENT
ADMINISTRATION,

        *Petitioner*,

  v.

IAFF LOCAL 1696, EQUALITY UTAH,
AMERICAN CIVIL LIBERTIES UNION OF
UTAH, JOHN DOE 1, and JOHN DOE 2,

        *Respondents–Intervenors*.

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................... iv

Introduction ............................................................................................................................ 1

Factual Background ............................................................................................................... 2

Argument ............................................................................................................................... 12

    I.      The DEA's use of administrative subpoenas to request UCSD records violates
          the Fourth Amendment. ......................................................................................... 12

         A.     People have a reasonable expectation of privacy in their prescription
             records and the confidential medical information those records reveal. ........ 13

              1.     Case law recognizes an expectation of privacy in medical
                   information. ........................................................................................ 14

              2.     The confidentiality of patient health information is protected by
                   longstanding medical ethical rules. ................................................... 16

              3.     Prescription records can reveal types of information that are
                   particularly sensitive and receive heightened protections. ................. 18

         B.     The State of Utah's limited ability to access records in the UCSD does
              not eliminate the reasonable expectation of privacy in those records. .......... 19

         C.     The lack of notice to the subject of the subpoena violates the Fourth
              Amendment. ..................................................................................................... 21

Conclusion ............................................................................................................................. 22

Index of Exhibits ................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Gant*, 556 U.S. 332 (2009) ....................................................... 12

*Berger v. New York*, 388 U.S. 41 (1967) ................................................... 22

*Bond v. United States*, 529 U.S. 334 (2000) ............................................. 13

*Chapman v. United States*, 365 U.S. 610 (1961) ....................................... 21

*City of L.A. v. Patel*, 135 S. Ct. 2443 (2015) ........................................... 12

*Couch v. United States*, 409 U.S. 322 (1973) ........................................... 13

*DeMassa v. Nunez*, 770 F.2d 1505 (9th Cir. 1985)................................... 16

*Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000) ................................. 15, 19

*Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133 (3d Cir. 1995) ..................... 16

*Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005)............................ 16, 18

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001) ........................... 14, 15

*Herring v. Keenan*, 218 F.3d 1171 (2000) ............................................... 18

*In re Gimbel*, 77 F.3d 593 (2d Cir. 1996) ................................................ 13

*In re Grand Jury Subpoena, JK-15-029* (*United States v. Kitzhaber*), No. 15-
  35434, 2016 WL 3745541 (9th Cir. July 13, 2016)............................... 12

*Jaffee v. Redmond*, 518 U.S. 1 (1996) ...................................................... 18

*Katz v. United States*, 389 U.S. 347 (1967) ......................................... 21, 22

*Kerns v. Bader*, 663 F.3d 1173 (10th Cir. 2011) ...................................... 15

*King v. State*, 535 S.E.2d 492 (Ga. 2000) ........................................... 18, 21

*Kyllo v. United States*, 533 U.S. 27 (2001)............................................... 21

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ............................................... 14

*Oliver v. United States*, 466 U.S. 170 (1984) .......................................... 14

*Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.*, 998 F. Supp. 2d 957 (D. Or. 2014) ........................................ 13, 16, 18, 21

*R v. Dixon* (1765) 97 Eng. Rep. 1047 (K.B.) .............................................................. 20

*See v. City of Seattle*, 387 U.S. 541 (1967) ............................................................... 13

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) ................................................ 19

*Smith v. Maryland*, 442 U.S. 735 (1979) .................................................................... 20

*State v. Skinner*, 10 So. 3d 1212 (La. 2009) ........................................................... 8, 15

*Stoner v. California*, 376 U.S. 483 (1964) .................................................................. 21

*Thurman v. State*, 861 S.W.2d 96 (Tex. App. 1993) .................................................. 21

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004) ................................. 15

*United States v. Dalia*, 441 U.S. 238 (1979) ............................................................. 22

*United States v. Donovan*, 429 U.S. 413 (1977) ....................................................... 22

*United States v. Freitas*, 800 F.2d 1451 (9th Cir. 1986) ........................................... 22

*United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108 (9th Cir. 2012) ............. 13

*United States v. Jacobsen*, 466 U.S. 109 (1984) ...................................................... 21

*United States v. Johns*, 851 F.2d 1131 (9th Cir. 1988) ............................................. 22

*United States v. Miller*, 425 U.S. 435 (1976) ............................................................. 20

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) ........................................... 21

*Whalen v. Roe*, 429 U.S. 589 (1977) .......................................................................... 15

*Wilson v. Arkansa*s, 514 U.S. 927 (1995) ................................................................... 22

**Statutes**

21 U.S.C. § 812 ............................................................................................................... 3

21 U.S.C. § 876 ............................................................................................................... 9

42 U.S.C. § 290dd-2 ...................................................................................................... 19

Ala. Code § 20-2-214 ......................................................................................................... 8

Alaska Stat. § 17.30.200 .................................................................................................... 8

Ga. Code Ann. § 16-13-60 ................................................................................................. 8

Iowa Code Ann. § 124.553 ................................................................................................ 8

Me. Rev. Stat. tit. 22, § 7250 ............................................................................................ 8

Minn. Stat. Ann. § 152.126 ............................................................................................... 8

Mont. Code Ann. § 37-7-1506 .......................................................................................... 8

Mont. Code Ann. § 46-4-301 ............................................................................................ 8

N.H. Rev. Stat. Ann. § 318-B:35 ...................................................................................... 8

Neb. Rev. Stat. § 71-2455 ................................................................................................. 8

Or. Rev. Stat. § 431A.865 ................................................................................................. 8

R.I. Gen. Laws § 21-28-3.32 ............................................................................................. 8

S.B. 42, 51st Leg., Gen. Sess. (Utah 1995) ...................................................................... 6

Utah Code Ann. § 58-37-2 ................................................................................................ 2

Utah Code Ann. § 58-37-4 ................................................................................................ 3

Utah Code Ann. § 58-37f-201 .......................................................................................... 2

Utah Code Ann. § 58-37f-203 .......................................................................................... 5

Utah Code Ann. § 58-37f-301 .......................................................................................... 8

Vt. Stat. Ann. tit. 18, § 4284 ............................................................................................ 8

**Other Authorities**

Dennis Romboy, *Unwarranted Drug Database Search Prompts New Utah Law,
    Lawsuits*, Deseret News (Apr. 23, 2015), http://www.deseretnews.com/article/
    865627152/Unwarranted-drug-database-search-prompts-new-Utah-law-
    lawsuits.html?pg=all ........................................................................................... 7, 8

Drug Enforcement Administration, Office of Diversion Control, *Controlled
    Substance Schedules*, http://www.deadiversion.usdoj.gov/schedules/#define ........................ 3

Drug Enforcement Administration, Office of Diversion Control, *Controlled Substances by CSA Schedule* (May 13, 2016), http://www.deadiversion.usdoj.gov/schedules/orangebook/e_cs_sched.pdf ............................ 3

Geoff Liesik, *Ex-Vernal Detective Faces Felony Charges for Accessing Utah Drug Database*, Deseret News (Jan. 11, 2013), http://www.deseretnews.com/article/865570548/Ex-Vernal-detective-faces-felony-charges-for-accessing-Utah-drug-database.html?pg=all ............................................................................................. 6

Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf .................................... 19

Letter from David N. Wolf, Assistant Att'y Gen., State of Utah, to Robert Churchwell, U.S. Dep't of Justice (June 25, 2015), https://www.scribd.com/document/319355947/DEA-database-subpoena-letter ...................... 9

Letter from Governor Michael O. Leavitt to Hon. Lane Beattie, President of the Senate, and Hon. Melvin R. Brown, Speaker of the House (Mar. 21, 1995) ........................... 6

Marlisse Silver Sweeney, *The Big Drug Database in the Sky: One Firefighter's Year-Long Legal Nightmare*, Ars Technica (May 12, 2015), http://arstechnica.com/tech-policy/2015/05/the-big-drug-database-in-the-sky-one-firefighters-year-long-legal-nightmare ............................................................................... 7

Marvin H. Sims, CSD Administrator, *Utah's Controlled Substance Database Program* (Sept. 2012), http://www.pdmpassist.org/pdf/PPTs/West2012/3_Sims_NewInitiatives.pdf. ................... 5, 6

New London Consulting & FairWarning, *How Privacy Considerations Drive Patient Decisions and Impact Patient Care Outcomes* (Sept. 13, 2011), https://www2.idexpertscorp.com/assets/uploads/Fairwarning_survey_on_privacy.pdf ............................................................................................................................. 17

Office of the Utah Legislative Auditor General, *A Review of the Use of the Controlled Substance Database by Law Enforcement* (Dec. 15, 2015), https://le.utah.gov/audit/15_eilr.pdf.................................................................................. 8, 9

Pew Research Center, *Public Perceptions of Privacy and Security in the Post-Snowden Era* (Nov. 12, 2014), http://www.pewinternet.org/files/2014/11/PI_PublicPerceptionsofPrivacy_111214.pdf ......................................................................... 14

Robert Gehrke, *Feds May Sue Utah over Law Aimed at Protecting Prescription Drug Records*, Salt Lake Trib. (July 2, 2015), http://www.sltrib.com/news/2688175-155/feds-may-sue-utah-over-law?fullpage=1 ........................................................... 9

Tom Harvey, *Fire Chief Sues over Alleged Misuse of Utah's Prescription
Database*, Salt Lake Trib. (Apr. 24, 2015),
http://www.sltrib.com/news/2438954-155/fire-chief-sues-over-alleged-misuse ................... 7

U.S. Dep't of Justice/Drug Enforcement Admin. Subpoena to Utah Controlled
Substance Database (June 16, 2015),
https://www.scribd.com/document/319355947/DEA-database-subpoena-letter ................... 10

Utah State Leg., Senate Day 28, Part 1 (Feb. 23, 2015),
http://utahlegislature.granicus.com/MediaPlayer.php?clip_id=18532&meta_id
=542332 (statement of Sen. Weiler) ........................................................................... 8

**Rules**

Utah Admin. Code R156-37f-203 ................................................................................ 5

Utah Admin. Code R156-37f-301 ................................................................................ 8

The IAFF Local 1696, Equality Utah, the American Civil Liberties Union of Utah, John Doe 1, and John Doe 2 (collectively, "Intervenors") are individuals or represent individuals whose protected health information and constitutional rights are at issue in this action. They moved to intervene in this lawsuit as Respondents–Intervenors on July 28, 2016. ECF No. 19. While that motion is still pending, Intervenors file this proposed memorandum in opposition to the Drug Enforcement Administration's petition.[1]

## INTRODUCTION

This case concerns the right to privacy under the Fourth Amendment in some of the most personal and sensitive information people have: prescription records and the confidential medical information they reveal. Prescription records can divulge information not only about the medications a person takes, but also about her underlying medical conditions, the details of her treatment, and her physician's confidential medical advice—all matters that society recognizes as deeply personal and private. Indeed, Utah law recognizes the need for privacy in this information by specifically requiring that law enforcement obtain a probable cause warrant before requesting such records from the Utah Controlled Substance Database ("UCSD"), a public health tool that allows physicians to check past prescriptions written for their patients. That requirement protects the individual privacy of millions of Utahns, including Intervenors in this action—Salt Lake County Firefighters IAFF Local 1696, Equality Utah, the ACLU of Utah, John Doe 1, and John Doe 2. Yet, claiming that the State's warrant requirement is preempted by federal law, the federal Drug Enforcement Administration ("DEA") now seeks to obtain numerous Utahns' sensitive prescription records using an administrative subpoena, which is issued without prior

---

[1] In the alternative, should this Court deny their motion to intervene, Intervenors respectfully request leave to file this brief as *amici curiae*.

judicial review upon a mere relevance standard. However, an unconstitutionally applied federal

statute has no preemptive force. The DEA's use of the administrative subpoena violates patients'

reasonable expectation of privacy in their prescription records and, therefore, runs afoul of the

Fourth Amendment to the U.S. Constitution. A probable cause warrant would be required for

federal agents to enter the inner sanctum of a person's home and rifle through the contents of her

medicine cabinet or bedside drawer; no less protection is required simply because the same

information is also stored in a secure database in digital form. As with any other search that

infringes on a reasonable expectation of privacy, the DEA must obtain a judicial warrant before

perusing a digital archive of patients' confidential health information. Intervenors urge the Court

to deny enforcement of the DEA's subpoena in order to safeguard their and other Utahns' Fourth

Amendment rights.

## FACTUAL BACKGROUND

A.      The Utah Controlled Substance Database

In 1995, the Utah legislature created the Utah Controlled Substance Database, an

electronic database maintained by the Utah Division of Occupational and Professional Licensing

("DOPL") that records information about "every prescription for a controlled substance

dispensed in the state to any individual other than an inpatient in a licensed health care facility.[2]"

"Controlled substance" means a drug or substance included in Schedules I–V of the federal

Controlled Substances Act or in Schedules I–V of Utah Code Ann. § 58-37-4.[3] The federal

Controlled Substances Act, 21 U.S.C. § 812, creates five categories of drugs, divided into

---

[2] Utah Code Ann. § 58-37f-201(5)(a).

[3] Utah Code Ann. § 58-37-2(f)(i).

schedules I–V.[4] Federal Schedule I drugs "have no currently accepted medical use in the United States, a lack of accepted safety for use under medical supervision, and a high potential for abuse," and are not available for prescription.[5] Drugs are placed in Schedules II–V based on "their relative abuse potential, and likelihood of causing dependence when abused."[6] The classification of controlled substances under Utah law basically tracks the federal scheme.[7] Controlled substances are used to treat a wide range of serious medical conditions, including weight loss associated with AIDS, anxiety disorders, post-traumatic stress disorder, panic disorders, alcohol addiction withdrawal symptoms, opiate addiction, testosterone deficiency, chronic and acute pain, seizure disorders, narcolepsy, insomnia, Attention Deficit Hyperactivity Disorder ("ADHD"), and migraines.[8] These conditions "are among some of the most frequently diagnosed conditions in Americans," meaning that it is "likely that state prescription drug monitoring programs ("PDMPs") will soon contain sensitive information about most Americans, if they do not already." Peel Decl. ¶¶ 6–7. Table 1 lists selected Schedule II–V medications used to treat these medical conditions. Attached as Exhibit B is a list of all Schedule I–V drugs.

---

[4] *See* Drug Enforcement Administration, Office of Diversion Control, *Controlled Substance Schedules*, http://www.deadiversion.usdoj.gov/schedules/#define (Ex. A).

[5] *Id.*

[6] *Id.*; *see also* 21 U.S.C. § 812(b) (providing criteria for placing drugs in Schedules I–V); Drug Enforcement Administration, Office of Diversion Control, *Controlled Substances by CSA Schedule* (May 13, 2016), http://www.deadiversion.usdoj.gov/schedules/orangebook/ e_cs_sched.pdf [hereinafter "Controlled Substances List"] (Ex. B).

[7] *Compare* Controlled Substances List, *supra* note 6, *with* Utah Code Ann. § 58-37-4.

[8] *See* Controlled Substances List, *supra* note 6; Decl. of Dr. Deborah C. Peel ¶ 5; Physicians' Desk Reference Drug Summaries (Ex. C) (drug information summaries for selected Schedule II–V medications showing medical conditions the drugs are approved to treat).

| TABLE 1[9]<br><br>Medical Condition | Medications Approved for Treatment of Condition |
|---|---|
| Hormone replacement therapy for treatment of gender identity disorder/gender dysphoria | Testosterone |
| Weight loss associated with AIDS | Marinol (dronabinol), Cesamet (nabilone) |
| Nausea & vomiting in cancer patients undergoing chemotherapy | Marinol (dronabinol), Cesamet (nabilone) |
| Trauma- and stressor-related disorders, including acute stress disorder and post-traumatic stress disorder (PTSD) | Xanax, Valium, Ativan, Librium, Traxene, other benzodiazepines |
| Anxiety disorders and other disorders with symptoms of panic | Xanax, Valium, Ativan, Lexotan, Librium, other benzodiazepines |
| Alcohol addiction withdrawal symptoms | Librium (chlordiazepoxide) |
| Opiate addiction treatment | Buprenorphine (Suboxone), methadone |
| Attention deficit hyperactivity disorder | Ritalin, Adderall, Vyvanse |
| Obesity (weight loss drugs) | Benzphetamine, Voranil, diethylpropion |
| Chronic or acute pain | Narcotic painkillers, such as codeine (including Tylenol with codeine), hydrocodone, Demerol, morphine, Vicodin, oxycodone (including Oxycontin and Percocet) |
| Epilepsy and seizure disorders | Nembutal (pentobarbital), Seconal (secobarbital), clobazam, clonazepam, Versed, Fycompa (perampanel) |
| Testosterone deficiency in men | Testosterone |
| Delayed puberty in boys | Testosterone, Android-F |
| Narcolepsy | Xyrem, Provigil |
| Insomnia | Ambien, Lunesta, Sonata, Restoril, Halcion, Doral, Ativan, Belsomra |
| Migraines | Butorphanol (Stadol) |
| Diarrhea | Lomotil, Motofen |
| Fibromyalgia | Lyrica |

Because many of these medications are approved only for treatment of specific medical

conditions, a prescription for a Schedule II–V drug will often reveal a patient's underlying

---

[9] Physicians' Desk Reference Drug Summaries, *supra* note 8; *see also* Peel Decl. ¶ 5.

diagnosis.[10] Thus, information about an individual's prescriptions can reveal a great deal of sensitive medical information.

After dispensing a controlled substance in Utah, pharmacists are required to electronically report to the UCSD the name, date of birth, gender, and street address of the patient; positive identification for the patient, including the identifying numbers on the patient's identification document; the name of the prescribing practitioner; and name of the drug and the strength, quantity, and dosage dispensed.[11] There is no statutory or regulatory limit on the duration of retention of the information in the UCSD. As of September 2012, there were more than 47 million prescription records in the database, with more than five million records uploaded to the UCSD in the preceding year.[12]

The privacy risks inherent in maintaining a database tracking the controlled substance prescriptions of every Utah resident have long been apparent. In 1995, then-Governor Michael Leavitt responded to the passage of legislation creating the UCSD with a letter to the Senate President and House Speaker outlining his concerns. Noting that the legislation allowed law enforcement and other individuals to access the database, Governor Leavitt cautioned that "[t]his may be an unwarranted intrusion into the privacy of persons who dispense and receive prescription drugs. I will be watching the use of this database. If the information from the

---

[10] Peel Decl. ¶ 3; Decl. of Professor Mark A. Rothstein ¶ 10; Physicians' Desk Reference Drug Summaries, *supra* note 8.

[11] *See* Utah Code Ann. § 58-37f-203(3); Utah Admin. Code R156-37f-203(1)(a).

[12] *See* Marvin H. Sims, CSD Administrator, *Utah's Controlled Substance Database Program*, 4, 6 (Sept. 2012), http://www.pdmpassist.org/pdf/PPTs/West2012/3_Sims_NewInitiatives.pdf (Ex. D).

database is used in any manner other than its intended purpose, I will seek to have the database disbanded."[13]

The Utah legislature in 1995 included some privacy protections in the bill creating the UCSD, including permitting physicians and pharmacists to access prescription data only for current patients, and making it a felony to access or use information in the database without authorization.[14] Law enforcement authorities were provided virtually unlimited access, however, and were allowed to log into the UCSD directly to download prescription records without any judicial oversight or individualized suspicion.[15]

Subsequent abuses of the database by law enforcement made clear the folly of permitting unfettered access. In one instance, in 2011 a Vernal police detective repeatedly obtained two individuals' prescription records from the UCSD outside the context of any legitimate law enforcement investigation and used that information in a scheme to steal prescription painkillers from them.[16] In another instance, in the course of investigating the theft of pain medication from several ambulances, a Cottonwoods Heights detective downloaded the prescription histories of at

---

[13] Letter from Governor Michael O. Leavitt to Hon. Lane Beattie, President of the Senate, and Hon. Melvin R. Brown, Speaker of the House (Mar. 21, 1995) (Ex. E).

[14] S.B. 42, 51st Leg., Gen. Sess. (Utah 1995), originally codified at Utah Code Ann. § 58-37-7.5(8)–(10) (Ex. F).

[15] *Id.*, originally codified at Utah Code Ann. § 58-37-7.5(8)(e) ("The manager of the database shall make information in the database available . . . to . . . federal, state, and local law enforcement authorities engaged as a specified duty of their employment in enforcing laws regulating controlled substances."); Sims, *supra* note 12, at 8 (noting that 744 law enforcement officers from 185 law enforcement agencies were "On-Line Registered Users" of the UCSD as of September 2012).

[16] Geoff Liesik, *Ex-Vernal Detective Faces Felony Charges for Accessing Utah Drug Database*, Deseret News (Jan. 11, 2013), http://www.deseretnews.com/article/865570548/Ex-Vernal-detective-faces-felony-charges-for-accessing-Utah-drug-database.html?pg=all (Ex. G).

least 480 firefighters, paramedics, and other employees of the Unified Fire Authority of Greater Salt Lake ("UFA") without any individualized suspicion as to any one of them. Decl. of Jeremy Robertson ¶¶ 10–11, ECF No. 19-1.[17] Although the detective did not link any of the UFA employees to the theft of the medications, he convinced a prosecutor to bring charges against two UFA employees, an assistant fire chief and a firefighter/paramedic, for alleged misuse of opioid pain medications. *Id.* ¶¶ 12–13. After being subjected to many months of criminal prosecution and humiliating press coverage, prosecutors dismissed the charges against both men with prejudice. *Id.* ¶ 14. As it turned out, these UFA employees' prescriptions for pain control medications tracked in the UCSD had all been "properly prescribed by treating physicians." *Id.* ¶¶ 15–16. Their ordeal would have been avoided completely had the detective been required to demonstrate individualized suspicion to a judge before gaining access to the UCSD. *Id.* ¶¶ 18– 19.

In recognition of Utah residents' privacy interest in their prescription records, and in response to the harms caused by law enforcement access to UCSD records without judicial oversight, the Utah legislature amended the UCSD statute in March 2015 to more strictly limit

---

[17] *See also* Marlisse Silver Sweeney, *The Big Drug Database in the Sky: One Firefighter's Year-Long Legal Nightmare*, Ars Technica (May 12, 2015), http://arstechnica.com/tech-policy/2015/05/the-big-drug-database-in-the-sky-one-firefighters-year-long-legal-nightmare (Ex. H); Tom Harvey, *Fire Chief Sues over Alleged Misuse of Utah's Prescription Database*, Salt Lake Trib. (Apr. 24, 2015), http://www.sltrib.com/news/2438954-155/fire-chief-sues-over-alleged-misuse (Ex. I); Dennis Romboy, *Unwarranted Drug Database Search Prompts New Utah Law*, *Lawsuits*, Deseret News (Apr. 23, 2015), http://www.deseretnews.com/article/ 865627152/Unwarranted-drug-database-search-prompts-new-Utah-law-lawsuits.html?pg=all (Ex. J).

access to information in the database.[18] The DOPL is now prohibited from disclosing

information in the database to law enforcement agencies unless presented with a "valid search

warrant . . . related to: (i) one or more controlled substances; and (ii) a specific person who is a

subject of the investigation."[19] By enacting this protection, Utah joined at least ten other states

that prohibit law enforcement from accessing records in those states' prescription drug

monitoring programs unless the government gets a warrant or otherwise demonstrates probable

cause.[20] Additional states bars access to PDMP records by law enforcement directly or on

request,[21] or make no provision for law enforcement access.[22]

---

[18] *See* Office of the Utah Legislative Auditor General, *A Review of the Use of the Controlled Substance Database by Law Enforcement*, 2 (Dec. 15, 2015), https://le.utah.gov/audit/15_eilr.pdf [hereinafter "Auditor General Review"] (Ex. K); Romboy, *supra* note 17; Utah State Leg., Senate Day 28, Part 1, timestamp 55:25–55:55, 56:52–56 (Feb. 23, 2015), http://utahlegislature.granicus.com/MediaPlayer.php?clip_id=18532&meta_id=542332 (statement of Sen. Weiler) ("This bill will interrupt what has become a standard practice in many police organizations throughout our state. It has become the status quo that when a person becomes under their radar, that they run to the prescription controlled substance database and they look and see what drugs people are taking. I hope that my Senate colleagues shudder at that thought. . . . We have had this database abused.").

[19] Utah Code Ann. § 58-37f-301(2)(m); *see also* Utah Admin. Code R156-37f-301(4)(a) ("Federal, state and local law enforcement authorities and state and local prosecutors requesting information from the Database . . . must provide a valid search warrant authorized by the courts").

[20] *See* Ala. Code § 20-2-214(7); Alaska Stat. § 17.30.200(d)(5); Ga. Code Ann. § 16-13-60(c)(3); Iowa Code Ann. § 124.553(1)(c); Kan. Stat. Ann. § 65-1685(c)(4); Minn. Stat. Ann. § 152.126(6)(b)(8); Mont. Code Ann. §§ 37-7-1506(1)(e), 46-4-301(3); N.H. Rev. Stat. Ann. § 318-B:35(I)(b)(3); Or. Rev. Stat. § 431A.865(2)(a)(D); R.I. Gen. Laws § 21-28-3.32(a)(4); *see also State v. Skinner*, 10 So. 3d 1212, 1218 (La. 2009) ("[A]bsent the narrowly drawn exceptions permitting warrantless searches, we hold a warrant is required to conduct an investigatory search of medical and/or prescription records.").

[21] Vt. Stat. Ann. tit. 18, § 4284.

[22] Me. Rev. Stat. Ann. tit. 22, § 7250(4); Neb. Rev. Stat. § 71-2455.

B.    DEA Warrantless Requests to the UCSD

Since the enactment of the warrant requirement in 2015, Utah law enforcement agencies have continued to be able to access UCSD records in legitimate investigations. According to an audit by the Office of the Legislative Auditor General, the UCSD received 71 warrants authorizing law enforcement searches of the database during the six-month period ending on November 11, 2015.[23]

Notwithstanding the requirement of a warrant based on probable cause under Utah law and the success of Utah law enforcement agencies in obtaining warrants, the DEA has attempted to obtain protected health information from the UCSD using administrative subpoenas pursuant to 21 U.S.C. § 876.[24] Section 876 permits certain federal law enforcement officials to issue and serve subpoenas seeking records "relevant or material" to a controlled substances investigation.[25] The subpoenas are issued without any requirement of probable cause and without first being presented to a court, and are judicially enforceable if the recipient declines to honor them.[26]

Since the enactment of the UCSD warrant requirement in 2015, the State of Utah has refused to comply with the DEA's § 876 subpoenas, including the subpoena at issue in this action, on the basis that complying with them would violate Utah law.[27] The DEA takes the

---

[23] Auditor General Review, *supra* note 18, at 3.

[24] *See* Pet. ¶ 9, ECF. No. 2; *see also* Robert Gehrke, *Feds May Sue Utah over Law Aimed at Protecting Prescription Drug Records*, Salt Lake Trib. (July 2, 2015), http://www.sltrib.com/news/2688175-155/feds-may-sue-utah-over-law?fullpage=1 (Ex. L).

[25] 21 U.S.C. § 876(a).

[26] *Id.* § 876(c).

[27] Letter from David N. Wolf, Assistant Att'y Gen., State of Utah, to Robert Churchwell, U.S. Dep't of Justice (June 25, 2015), https://www.scribd.com/document/319355947/DEA-database-subpoena-letter (Ex. M); Pet. ¶ 11; Gehrke, *supra* note 24.

position that federal law preempts Utah's requirement of a probable cause warrant.[28] The DEA

petitioned this Court on June 14, 2016 to enforce the subpoena, dated November 12, 2015.

The subpoena at issue in this action seeks the "FULL controlled substance report . . . of

all prescriptions for controlled medications . . . written by [a physician] for the time period of

January 8, 2015 to present."[29] The subpoena specifically requests the names and other

identifying information of the doctor's patients, and states that "de-identified information cannot

reasonably be used."[30]

C.     Intervenors' Expectation of Privacy in their Prescription Records in the UCSD

The information contained in the UCSD and requested by the DEA implicates the privacy

rights of Utah residents and physicians practicing in Utah, including Intervenors. If the DEA

were permitted to obtain prescription records from the UCSD without a warrant based on

probable cause, it would be able to learn what Schedule II–V medications individuals are taking

and, by extension, the nature of their underlying medical conditions. Peel Decl. ¶ 3. This

uncovering of highly sensitive and deeply personal information would violate the reasonable

expectation of privacy that doctors and patients have in their protected health information. *Id.*

Intervenors and the individuals they represent have prescriptions that are recorded in the

UCSD.[31] John Doe 1 is an attorney in private practice in Utah who takes Adderall, Dexedrine,

---

[28] Pet. ¶ 12.

[29] U.S. Dep't of Justice/Drug Enforcement Admin. Subpoena to Utah Controlled Substance Database (June 16, 2015), https://www.scribd.com/document/319355947/DEA-database-subpoena-letter (attached as Ex. A to the Letter from David N. Wolf, *supra* note 27, & Ex. M).

[30] *Id.*

[31] *See* Decl. of John Doe 1 ¶¶ 4–7, ECF No. 19-4; Decl. of John Doe 2 ¶¶ 4–5, ECF No. 19-5; Robertson Decl. ¶¶ 6–7; Decl. of Troy Williams ¶¶ 5–8, ECF No. 19-2; Decl. of Karen McCreary ¶¶ 6–7, ECF No. 19-3.

and Desoxyn—all Schedule II drugs—to treat his ADHD. Doe 1 Decl. ¶¶ 3–17. John Doe 2, also

an attorney, has taken clonazepam, a Schedule IV drug, to treat his depression and anxiety in the

past. He has also taken Adderall to treat his ADHD, and hydrocodone, a Schedule II drug, to

treat pain after surgery. Doe 2 Decl. ¶¶ 3–27. Both individuals consider information about their

prescriptions and the health conditions they treat to be private, and they are distressed by the

prospect of the DEA's gaining access to them without a warrant. Doe 1 Decl. ¶¶ 19–22; Doe 2

Decl. ¶¶ 28–31.

Salt Lake County Firefighters IAFF Local 1696 ("Local 1696") is a union representing

firefighters and paramedics in Salt Lake County, Utah. Because of the physical demands and

dangers of firefighting, firefighters are at high risk of injury, including strains, sprains, and

muscular pain. Treatment of such injuries often requires pain medication prescribed by a

physician, including opioids that are tracked in the UCSD. As described above, before the

enactment of the UCSD warrant requirement, members of Local 1696 suffered violations of their

privacy and erroneous prosecutions on the basis of searches conducted by Utah law enforcement

without probable cause or individualized suspicion. If the DEA were allowed to obtain

prescription records from the UCSD without a warrant, Local 1696's members would fear

unjustified access to their sensitive medical information, unnecessary scrutiny by law

enforcement agents, and groundless prosecution. Robertson Decl. ¶¶ 3–22.

Equality Utah works to secure equal rights and protections for lesbian, gay, bisexual and

transgender Utahns and their families. Many transgender men are prescribed hormone

replacement therapy in the form of testosterone, which is a Schedule III drug. Information about

the quantity and frequency of a patient's testosterone prescriptions is private and highly sensitive

because it can reveal not only that the person is transitioning from female to male sex, but also the stage of their transition. Equality Utah therefore, seeks to prevent the DEA from gaining access to that information without a warrant. Williams Decl. ¶¶ 3–11. The American Civil Liberties Union of Utah ("ACLU of Utah") is a membership organization whose members include Utahns who fill prescriptions for medications that are recorded in the UCSD. Members also include licensed Utah physicians who write prescriptions for medications that are recorded in the UCSD and who have an interest in maintaining the privacy of their patients' records. The ACLU of Utah represents those members in asserting their privacy rights in this action. McCreary Decl. ¶¶ 3–8.

## ARGUMENT

### I.  The DEA's use of administrative subpoenas to request UCSD records violates the Fourth Amendment.

Where an individual has a reasonable expectation of privacy in an item or location to be searched, the search is "per se unreasonable" under the Fourth Amendment unless conducted pursuant to a judicial warrant.[32] Only if there is no reasonable expectation of privacy, or if one of the "few specifically established and well-delineated exceptions" to the warrant requirement applies, may government officials conduct a warrantless search.[33] Accordingly, the government may use an administrative subpoena to conduct a search only if the target of the search lacks a reasonable expectation of privacy in the requested records.[34] Courts have therefore permitted use

---

[32] *City of L.A. v. Patel*, 135 S. Ct. 2443, 2452 (2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)).

[33] *Id.* (quotation marks omitted).

[34] *See In re Grand Jury Subpoena, JK-15-029* (*United States v. Kitzhaber*), No. 15-35434, 2016 WL 3745541, at *6 (9th Cir. July 13, 2016) (quashing subpoena to "prevent the trampling

of subpoenas only after determining that the target of the investigation lacked a reasonable expectation of privacy in the items or records law enforcement seeks.[35]

When an administrative subpoena is proper, it is issued upon a relevance standard and governed by the reasonableness test set forth in *See v. City of Seattle*, 387 U.S. 541, 544–45 (1967), and elsewhere. *See* DEA Br. 4, ECF No. 7. The question here is not whether the DEA's subpoena is overbroad or overly burdensome, however. Rather, it is whether an administrative subpoena is the proper mechanism for obtaining records and information in which people have a reasonable expectation of privacy under the Fourth Amendment. It is not.[36]

### A. People have a reasonable expectation of privacy in their prescription records and the confidential medical information those records reveal.

To establish a reasonable expectation of privacy under the Fourth Amendment, a person must demonstrate an actual expectation of privacy in the item or location searched, and that the expectation is "one that society is prepared to recognize as reasonable."[37] In this analysis, the Supreme Court "has given weight to such factors as the intention of the framers of the Fourth

---

of [the investigative subject's] reasonable expectation of privacy"); *In re Gimbel*, 77 F.3d 593, 599 (2d Cir. 1996).

[35] *E.g.*, *Couch v. United States*, 409 U.S. 322, 336 n.19 (1973) ("The [subpoena] satisfied the requirements in *United States v. Powell*, 379 U.S. 48, 57–58[] (1964), and, as explained above, the necessary expectation of privacy to launch a valid Fourth Amendment claim does not exist."); *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1116 (9th Cir. 2012) (upholding DEA administrative subpoena for electricity consumption records from power company only after finding that customers lack reasonable expectation of privacy in the records).

[36] Because the Controlled Substances Act, 21 U.S.C. § 876, violates the Fourth Amendment as applied to records in the UCSD, it cannot preempt Utah's warrant requirement. *See Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.* ("*Oregon PDMP*"), 998 F. Supp. 2d 957, 963 (D. Or. 2014), *appeal pending*, No. 14-35402 (9th Cir.) ("If the DEA's administrative subpoenas violate the Fourth Amendment as applied to the PDMP, . . . there is no conflict between [the state-law warrant requirement] and federal law.").

[37] *Bond v. United States*, 529 U.S. 334, 338 (2000) (quotation marks and citation omitted).

13

Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion."[38]

Warrantless access to confidential medical records impinges on privacy expectations recognized by societal understandings, case law, and longstanding principles of medical ethics.[39] These sources explain society's consensus that medical and prescription records are private. People consider information about the "state of their health and *the medicines they take*" to be among the most private information about them, with more people deeming it sensitive than the contents of their emails or text messages, their relationship histories, or their religious views.[40]

> ### 1.    Case law recognizes an expectation of privacy in medical information.

In *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Supreme Court held that patients have a reasonable expectation of privacy in their medical records. The case addressed whether the "special needs" exception to the Fourth Amendment's warrant requirement provides a state hospital with "authority to conduct drug tests [of patients] and to turn the results over to law enforcement agents without the knowledge or consent of the patients."[41] Before concluding that the special needs exception did not apply—and thus that the hospital had violated the Fourth Amendment—the Court held that "[t]he reasonable expectation of privacy enjoyed by the typical

---

[38] *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality op.) (quoting *Oliver v. United States*, 466 U.S. 170, 178 (1984)).

[39] As set forth in declarations, Intervenors and other Utahns with prescription information in the UCSD have a subjective expectation of privacy in those records. *See* Doe 1 Decl. ¶¶ 19–20; Doe 2 Decl. ¶¶ 28–31; Williams Decl. ¶¶ 9–10; Robertson Decl. ¶¶ 6–8; Peel Decl. ¶ 18.

[40] Pew Research Center, *Public Perceptions of Privacy and Security in the Post-Snowden Era*, 32 (Nov. 12, 2014), http://www.pewinternet.org/files/2014/11/PI_PublicPerceptionsofPrivacy _111214.pdf (Ex. N) (emphasis added).

[41] *Ferguson*, 532 U.S. at 77.

patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent."[42] The Court found that principle to be uncontroversial, noting that "in none of our prior cases was there any intrusion upon that kind of expectation" and that "we have previously recognized that an intrusion on that expectation may have adverse consequences because it may deter patients from receiving needed medical care."[43] Although the Court has not addressed the privacy interest under the Fourth Amendment in prescription records in particular, its reasoning in *Ferguson* applies with equal force to medical records beyond diagnostic test results, including confidential prescription information that can reveal just as much about an underlying diagnosis as can the test results themselves.

Courts around the country have made clear that there is a reasonable expectation of privacy in all manner of medical records, including prescription records,[44] treatment records held by a substance abuse treatment center,[45] and medical records held by an abortion provider.[46] As the Tenth Circuit has explained, "a patient has a privacy interest in medical records held by a third party medical services provider."[47] That court has also specifically recognized the privacy interest in prescription records, explaining that "protection of a right to privacy in a person's prescription drug records, which contain intimate facts of a personal nature, is sufficiently

---

[42] *Id*. at 78.

[43] *Id*. at 78 & n.14 (citing *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977)).

[44] *See State v. Skinner*, 10 So. 3d 1212, 1218 (La. 2009).

[45] *See Doe v. Broderick*, 225 F.3d 440, 450–51 (4th Cir. 2000).

[46] *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004) ("[A]ll provision of medical services in private physicians' offices carries with it a high expectation of privacy for both physician and patient.").

[47] *Kerns v. Bader*, 663 F.3d 1173, 1184 (10th Cir. 2011).

similar to other areas already protected within the ambit of privacy. Information contained in prescription records . . . may reveal other facts about what illnesses a person has."[48]

Because of the strong expectation of privacy in medical information, the only federal court to expressly address whether people have a reasonable expectation of privacy in prescription records in a state PDMP has held that they do, and that the warrant requirement applies.[49] As that court held, "the DEA's use of administrative subpoenas to obtain prescription records from the PDMP violates the Fourth Amendment."[50]

### 2. The confidentiality of patient health information is protected by longstanding medical ethical rules.

The confidentiality of patient medical information has been "a cornerstone of medical practice throughout much of the world" for millennia and is protected today by codes of ethics of medical professional societies. Rothstein Decl. ¶ 3. This constitutes an important source of patients' reasonable expectation of privacy in their medical information.[51]

The ancient Oath of Hippocrates required physicians to maintain patient secrets. Rothstein Decl. ¶ 3. In American medical practice, preserving the confidentiality of patient health information was part of the earliest codes of ethics of medical societies in the 1820s and 1830s, the first Code of Medical Ethics of the American Medical Association in 1847, and subsequent editions of that code. Decl. of Robert Baker ¶¶ 13–16; Rothstein Decl. ¶ 3. Today,

---

[48] *Douglas v. Dobbs*, 419 F.3d 1097, 1102 (10th Cir. 2005); *accord Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133, 1138 (3d Cir. 1995).

[49] *Oregon PDMP*, 998 F. Supp. 2d at 966–67.

[50] *Id.* at 967.

[51] *See DeMassa v. Nunez*, 770 F.2d 1505, 1506–07 (9th Cir. 1985) (per curiam) (identifying rules of professional conduct and other sources of professional ethics as source of clients' reasonable expectation of privacy in client files possessed by attorneys).

nearly all patients (97.2 percent) believe that health care providers have a "legal and ethical responsibility to protect patients' medical records."[52]

Medical confidentiality was an established norm in colonial and founding-era America, and the framers of the Fourth Amendment were well aware of the need for maintaining the confidentiality of patients' medical information. Baker Decl. ¶¶ 4–12, 19. Beginning in the 1730s, formally trained physicians in colonial America were required to sign an oath swearing "never, without great cause, to divulge anything that ought to be concealed, which may be heard or seen during professional attendance." *Id.* ¶ 6 (quotation marks omitted). The signers of the Declaration of Independence, delegates to the Constitutional Convention, and members of the First Congress included physicians who would have sworn to keep patients' medical information confidential. *Id.* ¶¶ 7–11. Founding-era patients, including the Fourth Amendment's framers, would have understood the guarantee of confidentiality of the medical information they shared with their physicians, including the prescribing orders written to an apothecary or pharmacist. *Id.* ¶¶ 12, 19.

The enduring guarantees of the confidentiality of patients' medical information are "essential in encouraging patients to provide their physicians with accurate and complete health information, without which medical care would be severely compromised." Rothstein Decl. ¶ 4. Without confidentiality protections, patients would "delay medical care or avoid treatment altogether" and suffer embarrassment, stigma, and economic harms. *Id.* ¶¶ 5–6. A lack of confidentiality protections can also lead to public health consequences and "can lessen societal

---

[52] New London Consulting & FairWarning, *How Privacy Considerations Drive Patient Decisions and Impact Patient Care Outcomes*, 9 (Sept. 13, 2011), https://www2.idexpertscorp.com/assets/uploads/Fairwarning_survey_on_privacy.pdf (Ex. O).

support for the health care system." *Id.* ¶¶ 7–8. The consequences of law enforcement gaining

easy access to medical records are particularly harmful because "[p]ermitting the State unlimited

access to medical records for the purposes of prosecuting the patient would have the highly

oppressive effect of chilling the decision of any and all [persons] to seek medical treatment."[53]

### 3.     Prescription records can reveal types of information that are particularly sensitive and receive heightened protections.

Records in the UCSD can indicate facts about patients' sex, sexuality, and sexually

transmitted infections, mental health, and substance abuse. *See* Peel Decl. ¶¶ 3–5. These are

"intimate facts of a personal nature,"[54] and "[i]t is difficult to conceive of information that is

more private or more deserving of Fourth Amendment protection."[55] For example, a number of

medications tracked in the UCSD are used to treat mental illness. Peel Decl. ¶ 5; Doe 2 Decl.

¶¶ 6–10. Information about mental health and mental illness is highly sensitive and is afforded

strong privacy protections.[56] A prescription for Marinol can reveal that a patient is being treated

for AIDS. Peel Decl. ¶ 5. As the Tenth Circuit has recognized, a person's HIV status "is entitled

to constitutional privacy protection."[57] A testosterone prescription can reveal both that a person

is transgender and the stage of his transition. Williams Decl. ¶ 9; Peel Decl. ¶¶ 5, 14. This highly

---

[53] *King v. State*, 535 S.E.2d 492, 496 (Ga. 2000); *see also* Peel Decl. ¶ 18.

[54] *Douglas*, 419 F.3d at 1102.

[55] *Oregon PDMP*, 998 F. Supp. 2d at 966.

[56] *See Jaffee v. Redmond*, 518 U.S. 1, 10 (1996) (establishing psychotherapist–patient privilege and explaining that "[b]ecause of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace").

[57] *Herring v. Keenan*, 218 F.3d 1171, 1175 (2000).

private information can expose a person to discrimination and opprobrium.[58] Finally, drugs

tracked by the UCSD can reveal information about substance abuse addiction and treatment,

including whether a person is in treatment for opiate addiction or alcohol addiction withdrawal.

Peel Decl. ¶ 5. In recognition of their sensitivity, Congress has imposed heightened

confidentiality protections for substance abuse treatment records and has limited access to them

by law enforcement and in criminal proceedings.[59] In short, "medical treatment records contain

intimate and private details that people do not wish to have disclosed, expect will remain private,

and, as a result, believe are entitled to some measure of protection from unfettered access by

government officials."[60] The expectation of privacy in prescription records and the medical

information they reveal is recognized by society as reasonable.

### B.  The State of Utah's limited ability to access records in the UCSD does not eliminate the reasonable expectation of privacy in those records.

A person can retain a reasonable expectation of privacy in prescription records even

though the records are held by the State. Although in some instances a person may lack a

reasonable expectation of privacy in records held by a third party, there is no categorical rule to

that effect, and courts have held that people retain a reasonable expectation of privacy in medical

records stored in a third party's files. *See supra* Part I.A.1. The Supreme Court's decisions in

---

[58] *See Smith v. City of Salem*, 378 F.3d 566, 568–69, 575 (6th Cir. 2004) (discussing discrimination against person diagnosed with gender identity disorder and holding that such discrimination violates Title VII); *see also* Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, 2 (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf (Ex. P) (cataloguing societal discrimination against transgender people).

[59] 42 U.S.C. § 290dd-2; *see also Broderick*, 225 F.3d at 450–51; Rothstein Decl. ¶ 12.

[60] *Broderick*, 225 F.3d at 451.

*United States v. Miller*, 425 U.S. 435 (1976), and *Smith v. Maryland*, 442 U.S. 735 (1979), are not to the contrary.

In *Miller* and *Smith*, the Court held that a bank depositor and a telephone subscriber had no expectation of privacy in records about their transactions held by the bank and their dialed telephone numbers held by the phone company. The mere fact of third-party custody of the records was not dispositive in either case, however, as the Court explained that courts "must examine the nature of the particular documents sought to be protected in order to determine whether there is a legitimate 'expectation of privacy' concerning their contents."[61] The Court's conclusion—that customers had no such expectation—turned not on the fact that the records were held by the bank or phone company, but on the fact that the customer "voluntarily conveyed" the information, and that the information was not "confidential" or particularly sensitive.[62] Indeed, the Court in *Miller* explicitly reserved judgment on whether records held by a third party but covered by "evidentiary privileges, such as that protecting communications between an attorney and his client," would receive greater Fourth Amendment protection.[63] The principle that records that are particularly private or privileged are not reachable via subpoena has a long pedigree in Anglo-American law.[64]

As the District of Oregon has explained,

this case is markedly different from *Miller* and *Smith* for two reasons. The first is that the PDMP's records are "more inherently personal or private than bank

---

[61] *Miller*, 425 U.S. at 442.

[62] *Id.*; *accord Smith*, 442 U.S. at 741–44.

[63] *Miller*, 425 U.S. at 443 n.4.

[64] *See R v. Dixon* (1765) 97 Eng. Rep. 1047 (K.B.) (holding that an attorney need not respond to a subpoena for his client's papers in connection with a forgery prosecution of the client).

records," and are entitled to and treated with a heightened expectation of privacy. Secondly, patients and doctors are not voluntarily conveying information to the PDMP. The submission of prescription information to the PDMP is required by law. The only way to avoid submission of prescription information to the PDMP is to forgo medical treatment or to leave the state. This is not a meaningful choice.[65]

In a variety of contexts under the Fourth Amendment, third-party access to a protected area or information for one limited purpose does not render that area or information suddenly unprotected from warrantless government searches.[66] The privacy interests protected by the Fourth Amendment are at their zenith in the context of the sensitive medical records at issue in this case, requiring the protection of a warrant.[67]

### C.    The lack of notice to the subject of the subpoena violates the Fourth Amendment.

The DEA subpoena at issue here seeks to prevent the State of Utah from providing notice to the subject of the search.[68] Unless the subject is criminally charged and the subpoena is

---

[65] *Oregon PDMP*, 998 F. Supp. 2d at 967 (citations omitted); *accord Thurman v. State*, 861 S.W.2d 96, 98 (Tex. App. 1993) (citation omitted) ("[T]he rule in *Miller* pertains to objects or information *voluntarily* turned over to third parties. A decision to use a bank may be voluntary. A decision to use a hospital for emergency care is not."); *King*, 535 S.E.2d at 495 ("Even if the medical provider is the technical 'owner' of the actual records, the patient nevertheless has a reasonable expectation of privacy in the information contained therein, since that data reflects the physical state of his or her body.").

[66] *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 34–36 (2001) (thermal signatures emanating from a home); *United States v. Jacobsen*, 466 U.S. 109, 114 (1984) (contents of packages entrusted to a shipping company); *Ka tz v. United States*, 389 U.S. 347 (1967) (contents of phone call transmitted via phone company's facilities); *Stoner v. California*, 376 U.S. 483, 488–90 (1964) (implicit consent to janitorial personnel to enter motel room does authorize police to search room); *Chapman v. United States*, 365 U.S. 610, 616–17 (1961) (landlord's authority to enter house for some purposes does not authorize warrantless search by police); *United States v. Warshak*, 631 F.3d 266, 285–87 (6th Cir. 2010) (email stored on a service provider's servers).

[67] *See* cases cited *supra* notes 44–49; *see also* Rothstein Decl. ¶¶ 4–8; Peel Decl. ¶¶ 3–4.

[68] *See* Subpoena, *supra* note 29 (requesting that DOPL "not disclose the existence of this request or investigation").

provided in discovery, he or she is unlikely to learn of the search. Patients of a doctor under

investigation whose prescription records are seized will likely *never* receive notice. The Fourth

Amendment, however, requires notice to the subject of a search or seizure.[69] Such notice may be

delayed as is reasonably necessary, but the government's duty to provide notice may not be

disposed of entirely.[70] Notice ensures that individuals whose privacy is invaded have an

opportunity to test the lawfulness of the government's searches and, where appropriate, to obtain

a remedy. DEA searches of UCSD records that are conducted by subpoena and without notice to

the affected parties therefore violate the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, this Court should deny enforcement of the DEA's subpoena.

August 5, 2016                                Respectfully submitted,

                                              /s/ Nathan Freed Wessler
                                              Nathan Freed Wessler (*pro hac vice*)
                                              Brett Max Kaufman (*pro hac vice*)
                                              American Civil Liberties Union Foundation
                                              125 Broad Street, 18th Floor
                                              New York, NY 10004
                                              (212) 549-2500
                                              nwessler@aclu.org

---

[69] *See Wilson v. Arkansa*s, 514 U.S. 927, 934 (1995) (holding that the principle of announcement "is an element of the reasonableness inquiry under the Fourth Amendment"); *Berger v. New York*, 388 U.S. 41, 60 (1967) (invalidating eavesdropping statute in part because it failed to require notice); *United States v. Donovan*, 429 U.S. 413, 430 (1977) ("The *Berger* and *Katz* decisions established that notice of surveillance is a constitutional requirement of any surveillance statute." (quoting 114 Cong. Rec. 14485–86 (1968) (statement of Sen. Hart))); *United States v. Freitas*, 800 F.2d 1451, 1456 (9th Cir. 1986) ("[T]he absence of any notice requirement in the warrant casts strong doubt on its constitutional adequacy.") (citation omitted); *United States v. Johns*, 851 F.2d 1131, 1135 (9th Cir. 1988).

[70] *See, e.g.*, *Katz*, 389 U.S. at 355 n.16 (notice cannot be delayed longer than is justified); *United States v. Dalia*, 441 U.S. 238, 247–48 (1979) (recognizing that notice is a constitutional requirement and that delayed notice is acceptable); *Freitas*, 800 F.2d at 1456.

22

/s/ John Mejia
_____
John Mejia, USB No. 13965
Leah Farrell, USB No. 13696
ACLU of Utah Foundation
355 North 300 West
Salt Lake City, UT 84103
(801) 521-9862
jmejia@acluutah.org

*Counsel for Respondents–Intervenors*[71]

---

[71] ACLU legal fellow Eliza Sweren-Becker, who is admitted to practice in New York State, contributed to the drafting of this brief.

## INDEX OF EXHIBITS

Drug Enforcement Administration, Office of Diversion Control, Controlled Substance
Schedules, http://www.deadiversion.usdoj.gov/schedules/#define ..........................................A

Drug Enforcement Administration, Office of Diversion Control, *Controlled Substances by CSA
Schedule* (May 13, 2016),
http://www.deadiversion.usdoj.gov/schedules/orangebook/e_cs_sched.pdf ...........................B

Physicians' Desk Reference Drug Summaries, www.PDR.net ......................................................C

Marvin H. Sims, CSD Administrator, *Utah's Controlled Substance Database Program* (Sept.
2012), http://www.pdmpassist.org/pdf/PPTs/West2012/3_Sims_NewInitiatives.pdf.............D

Letter from Governor Michael O. Leavitt to Hon. Lane Beattie, President of the Senate, and Hon.
Melvin R. Brown, Speaker of the House (Mar. 21, 1995).......................................................E

S.B. 42, 51st Leg., Gen. Sess. (Utah 1995).................................................................................F

Geoff Liesik, *Ex-Vernal Detective Faces Felony Charges for Accessing Utah Drug Database*,
Deseret News (Jan. 11, 2013), http://www.deseretnews.com/article/865570548/Ex-Vernal-
detective-faces-felony-charges-for-accessing-Utah-drug-database.html?pg=all.....................G

Marlisse Silver Sweeney, *The Big Drug Database in the Sky: One Firefighter's Year-Long Legal
Nightmare*, Ars Technica (May 12, 2015), http://arstechnica.com/tech-policy/2015/05/the-
big-drug-database-in-the-sky-one-firefighters-year-long-legal-nightmare..............................H

Tom Harvey, *Fire Chief Sues over Alleged Misuse of Utah's Prescription Database*, Salt Lake
Trib. (Apr. 24, 2015), http://www.sltrib.com/news/2438954-155/fire-chief-sues-over-alleged-
misuse .......................................................................................................................................I

Dennis Romboy, *Unwarranted Drug Database Search Prompts New Utah Law*, *Lawsuits*,
Deseret News (Apr. 23, 2015), http://www.deseretnews.com/article/865627152/
Unwarranted-drug-database-search-prompts-new-Utah-law-lawsuits.html?pg=all .................J

Office of the Utah Legislative Auditor General, *A Review of the Use of the Controlled Substance
Database by Law Enforcement* (Dec. 15, 2015), https://le.utah.gov/audit/15_eilr.pdf ............K

Robert Gehrke, *Feds May Sue Utah over Law Aimed at Protecting Prescription Drug Records*,
Salt Lake Trib. (July 2, 2015), http://www.sltrib.com/news/2688175-155/feds-may-sue-utah-
over-law?fullpage=1 ................................................................................................................L

Letter from David N. Wolf, Assistant Att'y Gen., State of Utah, to Robert Churchwell, U.S.
Dep't of Justice (June 25, 2015), https://www.scribd.com/document/319355947/DEA-
database-subpoena-letter..........................................................................................................M

Pew Research Center, *Public Perceptions of Privacy and Security in the Post- Snowden Era* (Nov. 12, 2014), http://www.pewinternet.org/files/2014/11/PI_PublicPerceptionsofPrivacy _111214.pdf ....................................................................................................................N

New London Consulting & FairWarning, *How Privacy Considerations Drive Patient Decisions and Impact Patient Care Outcomes* (Sept. 13, 2011), https://www2.idexpertscorp.com/assets/uploads/Fairwarning_survey_on_privacy.pdf ..........O

Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf ..................................... P